IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

        vs.                                     Case No. 1:23-cr-01711-KWR-1

ELENA CHAVIRA-ORNELAS,

   Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Defendant's Motion to Dismiss the Indictment (**Doc. 26**). After reviewing the briefings and the relevant law, the Court finds that the motion is not well-taken and, therefore, is **DENIED.** Ms. Chavira-Ornelas' request for an evidentiary hearing is also denied.[1]

## BACKGROUND

On December 27, 2022, Defendant Elena Chavira-Ornelas was arrested by the Albuquerque Police Department (APD) and was found in possession of a Taurus TCP .380 caliber handgun. **Docs. 1 at 3; 26 at 2.** On May 12, 2023, Ms. Chavira-Ornelas was arrested again by APD and was found in possession of a Taurus G2c 9mm caliber handgun. *Id.* On November 21, 2023, Ms. Chavira-Ornelas was indicted on two counts of knowingly possessing a firearm and ammunition

---

[1] A court may deny a requested evidentiary hearing when it would reveal "no further, useful information." *United States v. Cornelius*, 696 F.3d 1307, 1326 (10th Cir. 2012); *United States v. Gonzalez-Fierro*, 949 F.3d 512, 524 n.11 (10th Cir. 2020). The parties do not appear to argue that there are disputed facts which the Court would need to resolve following an evidentiary hearing. Here, the Court accepts as true all of Ms. Chavira-Ornelas' factual assertions about her ties to United States for the purpose of her motion to dismiss the indictment. *See United States v. Sandoval*, 390 F.3d 1294, 1301 (10th Cir. 2004) ("Generally speaking, an evidentiary hearing is not required unless the requesting party shows that he will produce relevant evidence … Because we accept Mr. Sandoval's proffered facts as true, there is no need for an evidentiary hearing.").

while knowing she was an alien "illegally or unlawfully in the United States," in violation of 18 U.S.C. §§ 922(g)(5) and 924. **Doc. 4.** Ms. Chavira-Ornelas asserts that she has lived in the United States since childhood, has attended school here, and has several familial ties to the United States, including her siblings, mother, and two children who are United States citizens. **Doc. 26 at 2, 6.** She moves to dismiss both counts of the indictment because § 922(g)(5) is unconstitutional as applied to her under the Second Amendment. *Id.*; *New York Rifle & Pistol Ass'n, Inc. vs. Bruen*; 597 U.S. 1 (2022); 18 U.S.C. §§ 922(g)(5).

## LEGAL STANDARD

The Second Amendment protects the "right of the people to keep and bear Arms." Const. amend. II. While the Second Amendment protects the fundamental right to individual self-defense, it is not an unlimited "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("The Court's opinion should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."). As such, Congress enacted several federal limitations on the Second Amendment right to bear arms, including § 922(g)(5), which forbids aliens that are "illegally or unlawfully in the United States" from "ship[ping] or transport[ing] in interstate or foreign commerce, or possess[ing] in or affecting commerce, any firearm or ammunition; or [receiving] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

In *Bruen*, the Supreme Court clarified the test that district courts must apply to decide whether the government unconstitutionally infringed on an individual's Second Amendment right. *Bruen*, 597 U.S. at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and

historical understandings."). A trial court must first determine whether the Second Amendment's plain text covers an individual's conduct. *Bruen*, 597 U.S. at 24 (reiterating that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). If it does, the government must justify its regulation by demonstrating that the infringement on the individual's right to bear arms is consistent with the nation's historical tradition of firearm regulation. *Id*.

A court must, therefore, determine if the modern firearm regulation is "relevantly similar" to an established historical tradition of firearm regulation. *Id.* at 28-29. To do so, *Bruen* first directs courts to assess whether the Founders specifically anticipated this type of historical regulation.[2] *Id.* at 28. If the modern regulation deals with a new societal issue or dramatic technological change, courts may utilize a more nuanced approach to determine if historical analogues exist to "circumstances beyond those the Founders specifically anticipated." *Id.* An analogue exists where the historical regulation imposes (i) a comparable burden on the right to self-defense as the contested regulation and (ii) a similar justification for that burden.[3] *Id.* at 29 (describing the two metrics that "render regulations relevantly similar under the Second Amendment" are the "how and

---

[2] Under this standard, a modern firearm regulation can be found unconstitutional when (1) a challenged regulation addresses a general societal problem that existed in the eighteenth century, but no historical regulation addressed the problem; (2) earlier generations addressed a societal problem in a materially different way; or (3) an earlier generation tried to enact a similar regulation that was rejected as being unconstitutional. *Bruen*, 597 U.S. at 26-27.

[3] This approach recognizes that firearms today pose different regulatory challenges from those that preoccupied legislators when the Second Amendment was ratified in 1791 or when the right to self-defense was extended to the states by the Fourteenth Amendment in 1868. *Id.* at 34 ("We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal."); *Heller*, 554 U.S. at 634-635 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Therefore, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphasis in original) (noting that analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check). The government's historical analogues must also be sufficiently established to demonstrate tradition. *Id.* at 46 ("For starters, we doubt that three colonial regulations could suffice to show a tradition of public-carry regulations.")

why the regulations burden a law-abiding citizen's right to armed self-defense"); *Heller*, 554 U.S. at 599.

## DISCUSSION

Ms. Chavira-Ornelas asks this Court to dismiss the indictment as unconstitutional as applied to her. First, Ms. Chavira-Ornelas argues that she is part of the "people" protected by the Second Amendment, even if the Government can prove that she is not a citizen of the United States. **Doc. 26 at 6-7.** Second, she argues that the modern alien in possession statute is inconsistent with this nation's historical traditions of firearm regulation. *Id.* **at 7-8** (arguing that "prior to the 1993 amendment [to the Gun Control Act of 1968], there were no legal restrictions on a non-resident alien's right to bear arms.")

The United States responds that the Second Amendment's reference to "the people" does not include non-citizens. **Doc. 29 at 7.** Even if it did, the Government argues that *Bruen* only applies to law-abiding individuals, which Ms. Chavira-Ornelas, because of her undocumented status, is not.[4] *Id.* It further argues that there is a long historical tradition of restricting firearm possession from non-citizens and those who had not pledged an oath of loyalty to the United States, satisfying the *Bruen* test. *Id.* **at 11-17.** The Court finds that even though the plain text of the Second Amendment presumptively protects Mr. Chavira-Ornelas' possession of firearms, there is a longstanding historical tradition of disarming groups that have not pledged an oath of loyalty to the United States, which includes undocumented immigrants.

A. **The plain text of the Second Amendment presumptively protects Ms. Chavira-Ornelas' conduct.**

---

[4] The United States notes that Ms. Chavira-Ornelas has been arrested, detained, and charged with homicide in state court. *See* **doc. 29 at 10 n. 2**; D-202-CR-1288. While *Heller* confirmed that the Second Amendment did not protect the "right of citizens to carry arms for any sort of confrontation," the Court does not consider these allegations against Ms. Chavira-Ornelas because she has not yet been convicted of any violent crime. *See* 554 U.S. at 595; *Bruen*, 597 U.S. at 71.

*Bruen's* first step requires this Court to determine whether the Second Amendment's plain text protects Ms. Chavira-Ornelas' possession of firearms. *See* 597 U.S. at 2. The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." Const. amend. II. Ms. Chavira-Ornelas argues that, even if the Government can prove that she is not a United States citizen, "she is part of the national community in this country," and therefore part of the "people" protected by the Second Amendment. **Doc. 26 at 6.** In response, the Government argues that the Second Amendment protects the rights of "ordinary, law-abiding citizens" to keep and bear arms; Ms. Chavira-Ornelas is in the United States illegally, which makes her not a "law-abiding citizen" within the scope of Second Amendment protections. ***See* doc. 29 at 10** (arguing that *Bruen* limits Second Amendment rights to "law-abiding citizens" on several occasions); *Bruen*, 597 U.S. at 8, 31-32.

While the Constitution does not define "the people," the phrase appears multiple times throughout the Bill of Rights. Const. amend I ("…the right of the people to peaceably assemble…"); IV ("the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); IX ("the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people"). *Heller* defined the scope of the term "the people" broadly to include "all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580; *United States v. Verdugo-Urquidez*, 494 U.S. 259, 256 (1990) (describing "the people" as a term of art that refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.").

As *Heller* directs, any analysis of the constitutionality of modern firearm regulations begins "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580. This strong presumption and the broad inclusivity of the

5

term "the people" indicates that the Second Amendment's plain text does not protect only a citizen's right to possess firearms for individual self-defense. *See id.*; *Bruen*, 597 U.S. at 24; *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168-69 (10th Cir. 2012) ("Yet despite this we hesitate to infer from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens.").

There is no textual indication that the population that encompasses "the people" is defined differently in the Second Amendment than it is described elsewhere in the Constitution; undocumented immigrants also receive the protections of the Fifth, Sixth, and Fourteenth Amendments. *See, e.g.*, Const. amends. I, IV, IX, X; *Heller*, 554 U.S. at 580; *Verdugo-Urquidez*, 494 U.S. at 256; *United States v. Leveille*, 659 F. Supp. 3d 1279, 1283 (D.N.M. Mar. 7, 2023). Finally, "while *Bruen* clearly establishes that being a law-abiding citizen is sufficient to be included in "the people" to whom the Second Amendment right is endowed, any indication that being a law-abiding citizen is necessary to be included in "the people" is dicta." *United States v. Espinoza-Melgar*, 2023 WL 5279654, at *3 (D. Utah. Aug. 16, 2023); *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3rd Cir. 2023) (*en banc*) (explaining that the "criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So, their references to 'law-abiding, responsible citizens" were dicta.").

Taking Ms. Chavira-Ornelas' assertions in her motion to dismiss as true, it is clear that she has significant ties to the United States, having lived here most of her life, worked and paid taxes, and raised a family here. **Docs. 26 at 2; 30 at 5.** The fact of her status as an undocumented individual or her allegedly unlawful behavior does not remove her Second Amendment protections under *Bruen*. *See Range*, 69 F. 4th at 101; *Espinoza-Melgar,* 2023 WL 5279654, at *3, *Huitron-Guizar*, 678 F.3d at 1168-69. The Court finds that Ms. Chavira-Ornelas is part of the national community and, therefore, presumptively protected by the Second Amendment. *See Verdugo-Urquidez*, 494 U.S. at 256; *Heller*, 554 U.S. at 580.

**B. The Government has demonstrated that § 922(g)(5) falls within this nation's history and tradition of disarming disloyal groups.**

Because Ms. Chavira-Ornelas' alleged firearm possession is presumptively protected conduct, the Government must demonstrate that § 922(g)(5) is consistent with this nation's history and tradition of firearm regulation. *See Bruen*, 597 U.S. at 26-27. The United States argues that, historically, the right to bear arms allowed colonial governments to disarm individuals who were considered disloyal, dangerous, or otherwise not part of the citizenry that swore allegiance to the United States. **Doc. 29 at 11-13.** *See Bruen*, 597 U.S. at 27 (describing a "straightforward historical inquiry" that applies when a "challenged regulation addresses a general societal problem that has persisted since the 18th century."). Second, the Government argues that there are historically analogous laws that show that § 922(g)(5) is within this nation's tradition of firearm regulation. *Id*.

Pre-*Bruen*, the Tenth Circuit rejected a Second Amendment challenge to § 922(g)(5), finding that "crime control and public safety are indisputably important interests" that support limitations on the rights of unlawfully present immigrants from possessing firearms. *Huitron-Guizar*, 678 F.3d at 1170 (holding that § 922(g)(5) applies regardless of whether the illegal entry occurred during childhood or knowingly during adulthood). As noted by the Defendant, § 922(g)(5) was enacted under the Gun Control Act of 1968, the purpose of which was to

> "keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime." S. Rep. No. 90–1097, *1170 at 22 (1968), 1968 U.S.C.C.A.N. 2112, 2113–14. The alien-in-possession ban was incorporated from a predecessor statute by the 1986 Firearm Owners' Protection Act, Pub. L. No. 99–308, 100 Stat. 449, likewise with the purpose of keeping instruments of deadly force away from those deemed irresponsible or dangerous. S. Rep. No. 98–583, at 12 (1986)."

*Id.* at 1169-70. These restrictions are consistent with the Supreme Court's repeated endorsement that Congress has the power to subject non-citizens to more stringent limitations and conditions

than citizens. *See Demore v. Kim*, 538 U.S. 510, 522 (2003) (Congress "may make rules as to aliens that would be unacceptable if applied to citizens."); *Reno v. Flores*, 507 U.S. 292, 305-06 (1993).

The Court first assesses whether undocumented immigrants possessing firearms was a "general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 27. Modern immigration restrictions first appeared in the late 1800s with the Chinese Exclusion Act and the Alien Contract Labor Act.[5] *Early American Immigration Policies*, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, 30 July 2020, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (last accessed 16 Aug. 2024); *United States v. Munoz-De La O*, 586 F. Supp. 3d 1032, 1-36 ( E. D. Wash. Feb. 18, 2022) ("The federal government first forayed into the realm of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years."); **doc. 29 at 15** ("While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century."). Before then, "Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s." *Id.* As the government admits, colonial legislatures clearly did not conceive of immigrants possessing firearms as a general societal problem, evidenced by a dearth of

---

[5] The Government cites several examples of historical practices to support their assertion that early American legislatures were concerned with noncitizens possessing firearms. **Doc. 29 at 11-14** (connecting the Second Amendment right to the preservation of the political community and a well-organized militia, and citing the common colonial practice of disarming persons who "refused to swear an oath of allegiance to the state or the United States" and those not considered part of the citizenry, like Native Americans); Robert H. Churchill, *Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007). However, these practices are not enough for a "straightforward historical inquiry" under *Bruen*, likely because these laws focus more on allegiance to the emerging state, rather than those individuals' citizenship status. *See* 597 U.S. at 27; *United States v. Leveille*, 659 F. Supp. 3d at 1283-1284, 1284 n. 3 ("The Court focuses on these historical laws pertaining to oaths of allegiance rather than on the disarmament of Native Americans, which the United States also references in its brief. The Court does not find the prior history of disarmament of Native Americans meaningfully comparable to present-day disarmament of undocumented immigrants. Native Americans were, of course, already present on the North American Continent before any Europeans arrived, and there was an element of direct conflict between colonists and Native Americans that is not present in present-day interactions between the United States Government and undocumented immigrants in the United States illegally.").

comprehensive immigration regulations in early American history. *See* **doc. 29 at 16** ("While immigration was present in the 18th century, the relevant phenomenon of illegal immigration is one of more recent provenances than the Second Amendment, such that a restriction geared to illegal immigrants in the 19th Century would not exist. Therefore, courts must look to analogous firearms restrictions during the time of the Second Amendment."); *id; Bruen,* 597 U.S. at 27.

Therefore, the constitutionality of § 922(g)(5) must be analyzed by way of the historical analogues identified by the Government. *See* **doc. 29 at 14-17**; *Bruen*, 597 U.S. at 28 ("[S]o too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]"). The two relevant metrics for comparison are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

The Court finds that the Government's historical examples barring those that refused to swear an oath of loyalty to the United States is sufficiently analogous to the restrictions imposed by § 922(g)(5). *See id.* As discussed above, § 922(g)(5) was passed by Congress to keep firearms away from individuals deemed irresponsible or dangerous. *See Huitron-Guizar*, 678 F.3d at 1169-70. Early American legislatures similarly were concerned with disarming those it considered dangerous, including individuals that would not swear allegiance to the United States or participated in rebellion against the nascent American state. *See Saul Cornell & Nathan DeDino*, A Well-Regulated Right: The Early American Origins of Gun Control, 73 FORDHAM L. REV. 487, 506, n.128-129 (2004) (collecting statutes); *Churchill*, 25 L. & HIST. REV. at 157, 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."); 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681, 761 (1971) (discussing both New Hampshire and Massachusetts as protecting the right to bear arms except where citizens were not "peaceable" or participated in "Actual Rebellion"); *Heller*, 554 U.S. at 604; *United States v.*

9

*Jimenez-Shiloh*, 1042, 1048 (11th Cir. 2022) ("These laws reveal an early feature of the emerging republic—the selective disarmament of groups associated with foreign elements.") (quoting Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. REV. 1521, 1548-49 (2010)).

Several other courts have connected oaths of loyalty to the requirements of modern immigration laws. *See Leveille*, 659 F. Supp. 3d at 1285 ("But at its base, the current immigration laws are the imperfect system the United States has set up as a proxy for national allegiance."); *Jimenez-Shiloh*, 34 F.4th at 1048 ("By refusing to take an oath of allegiance to the state, those associated with foreign governments renounced their membership in the American political community and, in doing so, forfeited the state's protection of their right to arms—even if they continued to live on American soil."); *United States v. Perez*, 6 F.4th 448 (2nd Cir. 2021); *United States v. Vazquez-Ramirez*, 2024 WL 115224, at *8 (E. D. Wash. Jan. 10, 2024) ("[T]he Court finds that loyalty oaths are sufficiently analogous to the language of § 922(g)(5).") (internal quotations omitted); *United States v. Gil-Solano*, 699 F. Supp. 3d. 1063, 1072 (D. Nev. Oct. 16, 2023) ("Therefore, despite not being a perfect match, historical laws banning firearm ownership for those who refused to swear allegiance to the sovereign are analogous to § 922(g)(5)'s prohibition directed at undocumented immigrants."); *Bruen*, 597 U.S. at 30 (holding that a relevant historical analogue need not be a "historical twin" or a "dead ringer").

The Court agrees with the Government that loyalty-based oaths are an appropriate historical analogue that demonstrates that § 922(g)(5) is consistent with this Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 24. As other courts and the Defendant express, the analogy between loyalty-based oaths and § 922(g)(5) is not perfect. *See, e.g., Leveille*, 659 F. Supp. 3d at 1285; *Gil-Solano*, 699 F. Supp. 3d. at 1072; *Vazquez-Ramirez*, 2024 WL 115224, at *8; **doc. 30 at 6** ("It follows that to overcome a challenge to Section 922(g)(5), a "distinctly similar"

historical regulation would be one that either denied or substantially abridged access to firearms by undocumented aliens or other non-citizens."). However, the Defendant mistakenly argues that *Bruen* holds the Government to much more stringent standard than it actually requires—a well-established and representative historical analogue, not a historical twin. *See Bruen*, 597 at 26, 30. The United States has met its burden here by demonstrating that the "how" and "why" of historic loyalty-based oaths and § 922(g)(5) is relevantly similar: a complete prohibition on an individual's right to access firearms for the purpose of keeping firearms out of the hands of risky or dangerous individuals who have not demonstrated allegiance to this country. *See id.* at 29-30.

## CONCLUSION

For the reasons described above, the Court finds that § 922(g)(5) does not violate the Second Amendment as applied to Ms. Chavira-Ornelas. The Government has identified sufficiently analogous historical limitations on the non-citizen's right to bear arms. **Doc. 29.** Because the United States has justified its regulation under *Bruen*, Ms. Chavira-Ornelas' Motion to Dismiss the Indictment (**Doc. 26**) is **DENIED**.

**IT IS SO ORDERED.**

                                                   /S/_____
                                                 KEA W. RIGGS
                                               UNITED STATES DISTRICT JUDGE